162228, X, Y, LLC v. ABS Global, Inc. Thank you again, Judge Newman. Kurt O'Neill, and may it please the Court, Kurt O'Neill for the appellant, X, Y. Your Honors, the Board found all challenge claims obvious over the combination of Seidel and Salisbury. That was in error because of erroneous claim construction. Separately, the Board found only some of the claims obvious over the Fugger reference. The Board there left intact the artificial insemination sample claims 25 through 27, and I'd like to confine my comments today to the more comprehensive ground of invalidity, namely the combination of Seidel and Salisbury, which was based, as I said, on the improper claim construction. Namely, the Board erred in construing the selected sperm sample of only one viable cell after the freezing and thawing process, the freezing step being step E of this method claim. The Board erred in several different ways in arriving at that result, and the key way the Board did that is to fail to look at specification which describes a selected sperm sample that is suitable for what is called standard or conventional in vitro fertilization or artificial insemination. There was much evidence as to what a standard sample is for in vitro fertilization. I mean the specification in column 11, line 34, says the frozen selected sperm sample invention is suitable for use in any method in which sperm is used, and the ICSI method falls within that, doesn't it? Your Honor, my answer is that a sperm sample which is sorted by machine into populations is not used and would never be used in the example given by the Board, which was something called ICSI. That's a procedure which we acknowledge is sometimes referred to as an IVF procedure, but the procedure involves finding one viable claim under a microscope and taking it into a single sperm cell through a hypodermic needle. But that ICSI is a conventional fertilization method. It is not, Your Honor. There was much evidence to the contrary. I'm excited for you here, but our expert went into some detail that this is highly non-standard and unconventional because it literally involves finding one viable cell under a microscope and taking it into the hypodermic needle. This patent, the disclosure, is entirely consistent that what we're doing here is using a machine to sort large volumes of cells for in vitro? Or for artificial insemination? Both, Your Honor. In vitro in the sense of placing the selected sperm sample in a petri dish, right, with an egg so that the sperm cells, they're mobile and so they swim and one will eventually penetrate. I want to come back to my question. I read you a sentence from Column 11. A frozen selected sperm sample invention is suitable for any method in which sperm are used, and why isn't an ICSI method within that sentence? Your Honor, you don't use a sample. Remember, what's claimed here is a selected sperm sample for the kind of in vitro fertilization referred to as ICSI. It is a single cell, not a sample. Samples are placed in, as I said, for IVF in a petri dish. Why isn't it a sample? Why isn't it a sample? Because, Your Honor, it's not separated into a discrete population based on a property and then established from that population a sample as is called for by the claim. I guess the phrase in Column 11 that Judge Dyke is pointing to, you know, the invention is suitable for use in any method in which sperm are used, I mean, it sounds very broad. I'd say you have to read that in the context of the rest of the specification, Your Honor. They're talking about a sample, not a sperm cell. There's no report here in the specification of sorting one sperm cell. In fact, that would be unnecessary. What about the Board's additional ruling at 830 where it said, you know, even if we're talking about something that's a much larger sample in the claim beyond a single viable sperm cell, the combination here of the references more than meets that. That's the whole point of the Seidel reference, which is to produce and collect a significant sample of, you know, the sperm to be used that then can be subsequently frozen. I mean, the Board did come up with that alternative holding, and so you have to also win on that one as well. Yes, Your Honor. The Board's analysis there is fatally defective. That alternative holding consists of exactly three sentences at Appendix A30, one of which is a mere conclusion. The other two sentences are citing largely XY's own expert testimony that if you freeze one of these Seidel samples, it will work. What the expert said, if you read her entire answer, is this is what is taught to us by the 425 patent. She did not say that a person skilled in the art would have that understanding at the time of the invention. So now, as I understand it, we're moving over to the question of whether it would be obvious to freeze the samples produced by Seidel. Yes, Your Honor. Okay, and then now we have the freezing prior art Salisbury, which makes it clear from decades ago that people were freezing sperm all the time. And then, as I understand it, your primary argument is, well, Seidel teaches away from the idea of freezing the resulting collected sperm using the Seidel method, Seidel slash Johnson method, maybe I'll call it that. What is your best statement from the Seidel reference that should have convinced the board that you should not ever freeze these samples? Your Honor, the best statement is the one discussed extensively at oral argument, which is that Seidel says that he tried chilling these samples and shipping them over a distance and that when they arrived, they failed. That's not freezing. No, Your Honor, but it is. I'm talking about, you know, there are a lot of columns in the Seidel reference. Which statement in the 920 patent? That tells me that the board lacked substantial evidence when it found that the Seidel reference does not teach away as you urged the board to find. That is the example three of Seidel, Your Honor, and it bridges columns 16 through 17. Okay, what page are they sending? A71, A72. I apologize, Your Honor, I've lost it. I think you said column 16 carrying over. Yes, Your Honor, bridging column 16 through 17. And there is an explicit statement there that he did attempt to chill these samples down and ship them. Okay, do you have... Do you have a quote? Yes, I do. The patent is at 808. 833 in the joint appendix, Your Honor? No, the poor metabolizer always got 24. And the passage that was focused on in the oral argument before the board was that, and I'm at column 17, lines 8 through 16. And there it's reported, and in response to Judge Dyke's question, I acknowledge it doesn't say freezing. But this is an instance in which he is reporting that he subjected these samples to the further stress of cooling and shipping and that at the distant end... Can you give me the quote? Yes, Your Honor. Where's the quote? Of 29 females inseminated with sperm cooled to 5C. That's at column 10. And then if you read through that, he reports significant decrease in fertility from those samples such that... Did he say... I don't see him saying that. Well, he says pregnancy... It says of 29 females inseminated with sperm cooled to 5 degrees Celsius during shipping, 14 were pregnant at four weeks of gestation. And he characterizes these as drastic fertility decreases. Yeah, yeah, but it's a result of the delay. The record is clear that delay in using the sperm results in degradation. It's not that they were cooled and therefore didn't work. It's that they took more time to use them. Well, Your Honor, I'm not disputing the finding of fact. Our evidence is to the contrary. My point is the board rejected XY's arguments of this lack of expectation of success by saying that your own expert said that sperm cells will survive freezing. And that we know that this will work. What our expert says is that this is what is taught to us by the 425 Act. Does any expert say that Seidel teaches that the cooling causes the degradation of the sperm? Your Honor, no. They say in general that further stresses cause degradation. That would include cooling, shipping... But there were other prior references where there was a sorting method done to sort out sperm cells and then freezing them, right? Well, of course, ABS characterized it that way, but the undisputed evidence was that those samples or sorting techniques did not actually work to effectively sort the sperm. So what if they didn't work? They may not have worked to sort, but the sperm survived the stresses of the sorting methods when they were frozen, right? Yes, Dr. Ratain. That's what their evidence showed, right? That's what the evidence showed. Why isn't that substantial evidence? Your Honor, my response to this is not consistent with the claim terminology, which is to actually successfully sort a sample and then freeze it. And my position is that prior art shows an unsuccessful sorting technique followed by freezing. It does not instill in any practitioner an expectation of using a genotyping test to identify... Okay. Let's hear from the other side. ...and what I think I'm hearing is an argument that has teased us to the point of destruction of all meaning. The term in the label... Mr. Trello. Thank you, Your Honor. May it please the Court, I'd like to pick up with a point that Mr. O'Neill was making about Seidel and what he pointed to as the best example of teaching away. And he points to that example in column 16 and 17, and he points in particular to the fact that in column 17, Seidel reports 41% were pregnant after 12 weeks or whatever it was, and he says that was a failure. But if you go to column 12 of Seidel, and I'll get the exact lines for you, near the bottom, lines like 55 to 60, he refers to 41% pregnancy rate as a good percentage of success. So what you see in Seidel with the cooling sample, the sample that was cooled, was a good percentage of success, and that is the best that they have as far as teaching away is concerned. The fact is that the 425 patent is a classic example of what KSR says is obvious. It combines two well-known techniques, uses them to perform the same functions each had always performed, and produces the precise result one would expect. XY, in its reply, criticizes the Board for its supposed eagerness to reach an unfair result, but in fact the Board reached the only result it could. Now, Seidel, far from teaching away, as the Board found, it gave rise to a reasonable expectation of success. We know, and it's undisputed, that unsorted sperm had been successfully frozen for decades. Salisbury taught that. Seidel reports, using his low-stress sorting method, and remember Seidel is all about lower-stress sorting methods, reports pregnancy rates for sorted and unsorted sperm cells that were not statistically significantly different from one another. So their equivalent success rates were sorted and unsorted. So you can freeze unsorted with a high likelihood of success. Seidel clearly would suggest you should have the same expectation of success with sperm that had been sorted, because it apparently hadn't been stressed enough to affect the pregnancy rate, and that stress is supposedly the big concern here. So there's absolutely no reason, based on Seidel, to think that freezing would have caused any more problems with sorted cells than it had decades earlier with unsorted. Also, as the Court noted, and as the Board noted, the prior art was full of examples of sorting techniques combined with freezing producing viable sperm. Now the Board acknowledged that some of those techniques were not as effective, didn't reliably sort, but I think that's not really the point. The point is that their expert described these techniques as very stressful, but nonetheless, in the prior art, it was routine to use those techniques and then freeze and then have viable sperm. The issue here was not about effective sorting, it was about would the stress of sorting methods somehow lead somebody not to want to freeze, and clearly that was not the case. I think it's worth noting also that in Column 4 of the 425 patent, there's a list of what the inventor refers to as exemplary sex selection methods that could be used with the invention. Included in that list are two of the references that sort and freeze, Botticaria and Lange. Now they're not identified by name, but if you look at the patent numbers, they're in the list of sorting methods that this inventor said could be used with his invention. You could sort using this technique and then freeze, and that practices his invention according to the specification. So there's absolutely no support for this notion that Seidel teaches away, and there also was a very clear expectation of success in combining these two prior art methods. The other thing to note, I think, and this is what the board was talking about I think in Appendix 30, the passage that Mr. O'Neill referred to, is that the motivation here, and it was undisputed that one of our ordinary skill would be motivated to combine sorting and freezing. And what's also undisputed in what the board was saying is that that is the invention. There is no modification, there are no adjustments, there are no technical obstacles to overcome. The person of ordinary skill who was motivated to make this combination would have the invention, and that is about as clear a case as obviousness as you can get. Now let me turn, since Mr. O'Neill started with claim construction, let me turn to that. And I think the first point to note on that is that it doesn't matter, because as I think Judge Chen, you pointed out, at Appendix 31 and at Appendix 30, the board notes that even if we forget about ICSI and methods that need small numbers of sperm, the result is unchanged. And that's for all of the reasons that the board had already explained and that I just alluded to. No teaching away, clear encouragement in the prior art to do this. But besides that, the claim construction is correct. As the court noted, the specification says this invention can be used with any method in which sperm are used. It refers to conventional methods such as artificial insemination and in vitro fertilization. Their expert characterized ICSI as a method of in vitro fertilization. And this notion that, well, you wouldn't need to sort and you wouldn't have a sorted sample if you were using ICSI doesn't make any sense. Johnson and Cran in their 1996 article identified ICSI as a fertilization method suitable for use with cells sorted using the Johnson technique. And the Fugger reference, which is the one that uses the testing with humans, used the Johnson technique to sort cells and then use those cells in ICSI to produce sex-selected offspring. So there's just a disconnect in this argument that you wouldn't use sorting with ICSI. Of course you would. Anytime you want to gender select the offspring, you're going to use sorting no matter what fertilization technique you use. So just to, if the court has no questions, just to wrap up, this is just two conventional methods used in a conventional way. And in fact, they had been used that way in the past. And they produce exactly the result one would expect. If the court has no questions, I'll yield the rest of my time. They hadn't been used together in the past. Other sorting methods. Other sorting methods, right. Other sorting methods hadn't been used in the past. But there was a clear, and the board described it as routine. It was routine in the prior art to use sorting methods and then to freeze and to have viable sperm cells afterwards. Yes, Your Honor. Any more questions? Thank you, Mr. Trello. Okay. Mr. O'Neill. I don't agree with that, Your Honor, but thank you because I think that what is going on. To be brief, I want to make clear, particularly in response to your question, X, Y does not raise a point of error of lack of substantial evidence or clearly erroneous fact findings here. Our two key points of error with respect to the combination of SIDEL and Salisbury on the correct structure of the claim are the following. Number one, the board used an improper teaching away analysis. The board looked for an express mention of freezing in SIDEL. The finding, then, is that we're not going to pursue this further. That's contrary to this court's clear case law that a teaching away can be implicit and that you need to evaluate the reference as a whole. The part of SIDEL that we relied on for teaching away is nowhere mentioned in the board's 30-some-odd-page decision, clearly indicating that we didn't get a fair hearing on our teaching away evidence because the reference doesn't explicitly mention freezing and doesn't explicitly say you should not freeze these things. Our second major point was that the board, under the proper claim construction, didn't do the analysis. And I go back again to page 30 of the appendix. This is the entirety of the board's analysis. Is it fair to say that column 12 describes a 41% rate of pregnancy as a good percentage of success? It expresses it as pregnancies declining with time out of the shipping container. And that's the exact percentage that came up in example 3? Correct. Okay. As I've said, the entirety of the board's analysis on obviousness, and more particularly expectation of success, consists of three sentences at page 17 under the right construction, and those three sentences don't get you there. In fact, one of those sentences is a heavy reliance to our own expert's testimony that if you use Seidel's disclosure and then freeze the cells, they will survive the process and produce a sufficient number to fertilize the eggs. The board used that very heavily. What the witness actually said is that teachings of the 425 patent ensued. Prior art, not anything in the prior art, not a person of skill. That's all. Thank you. Thank you both. The case is taken under submission.